**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION**

**MANESSAH L. GREER** **PLAINTIFF**

**v.** **NO. 1:19-cv-00061 PSH**

**ANDREW SAUL, Commissioner of the Social Security Administration** **DEFENDANT**

# MEMORANDUM OPINION AND ORDER

In this case, plaintiff Manessah L. Greer ("Greer") maintains that the findings of an Administrative Law Judge ("ALJ") are not supported by substantial evidence on the record as a whole.[1] Greer so maintains for two reasons: 1) her migraine headaches were not evaluated in accordance with Listing 11.02, and 2) her residual functional capacity was erroneously assessed because the medical opinions were not given proper weight, and insufficient consideration was given to the side effects of her medication.

---

[1] The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support the [ALJ's] conclusion." See Id.

Greer was born on October 28, 1985, and was twenty-nine years old on June 30, 2015, i.e., the day she allegedly became disabled. In her applications for disability insurance benefits and supplemental security income benefits, she alleged that she is disabled as a result of multiple sclerosis ("MS"). The Commissioner of the Social Security Administration ("Commissioner") represents that the relevant period is from June 30, 2015, through November 27, 2018, i.e., the date of the ALJ's decision.

Prior to the relevant period, Greer underwent testing for reoccurring headaches and came to be diagnosed with Radiologically Isolated Syndrome ("RIS"), see Transcript at 268, an impairment characterized as a "step before MS," see Transcript at 318.[2] The impairment was believed to be a separate entity from her headaches. See Transcript at 268.

Greer saw Dr. Kathryn Chenault, M.D., in 2014 for left side numbness and tingling and reoccurring headaches. See Transcript at 267-269 (01/06/2014), 270-271 (03/18/2014), 272-273 (03/31/2014). Because RIS has a high correlation with MS, Greer was treated with disease modifying therapy for MS. She was treated with medication for her headaches.

2 The Court notes the medical evidence prior to June 30, 2015, primarily for the purpose of placing Greer's medical condition in an historical context. In addition, because Greer does not challenge the mental portion of the ALJ's residual functional capacity assessment, the evidence relevant to Greer's mental limitations will not be summarized.

Greer also saw Dr. James Zini, D.O., ("Zini") in 2014 for MS and headaches. See Transcript at 341-344 (06/03/2014), 338-340 (08/05/2014), 334-337 (10/06/2014), 330-333 (12/02/2014), 326-329 (12/30/2014). His progress notes reflect that he was uncertain whether she "actually has MS or if her body is mimicking symptoms of MS." See Transcript at 326. He did note, though, that an MRI of her cervical spine was consistent with "MS plaques" and an MRI of her brain revealed abnormalities. See Transcript at 328. He noted that her symptoms were constant but moderate and were relieved with pain medication, muscle relaxants, and rest. Zini's progress notes additionally reflect that Greer's headaches were intermittent, were relieved with medication and movement, but were exacerbated when she remained still.

Greer additionally saw Dr. Krishna Mylavarapu, M.D., ("Mylavarapu") in 2014 for MS. See Transcript at 276-279. Greer's history of present illness included the following complaints:

> ... She [complains of] left side pain, headaches, and fatigue. She reports her headaches occur everyday. She [complains of] photophobia and phonophobia associated with headaches. She takes Midrin [as needed]. It does not help. She [complains of] intermittent numbness in hands and feet at times. ...

See Transcript at 276. A physical examination was unremarkable. MS, migraines, and medication overuse headaches were diagnosed. Testing was ordered, and amitriptyline was prescribed.

MRI testing of Greer's brain and cervical spine was performed in December of 2014. See Transcript at 306-307. The results of the brain MRI revealed periventricular white matter areas of demyelination and gliosis consistent with MS but no enhancing lesions. The results of the cervical spine MRI revealed a "lesion at the C3 level and a small area both on the right and left side of the cord at the C4-5 level," which was consistent with "MS plaques." See Transcript at 307.

Greer appears to have seen Mylavarapu on four occasions in 2015. See Transcript at 280-282 (01/21/2015), 283-285 (04/29/2015), 286-288 (10/26/2015), 289-291 (11/03/2015). His progress notes reflect that her headaches improved with amitriptyline, but she eventually stopped taking it. She had also been receiving Plegridy injections but had stopped them as well because they caused a loss of sensation in her right arm. In October of 2015, she reported that she did not want any "'man made' medications for [now]." See Transcript at 288. Mylavaraup ordered additional MRI testing, which was performed in October of 2015. The results of Greer's brain MRI revealed the following:

> Stable bilateral callosal and pericallosal areas of FLAIR signal abnormality oriented perpendicular to the corpus callosum compatible with multiple sclerosis. No new plaques are seen. No restricted diffusion or enhancement is seen to suggest active plagues.

See Transcript at 304. The results of Greer's cervical spine MRI revealed the following:

> A new, 12-mm enhancing plaque is identified in the posterior spinal cord towards the right of midline at the C6 level. Previously noted signal abnormality at the C3 level has decreased in intensity. Findings are compatible with active multiple sclerosis. Given cord lesions, Devic's disease should also be considered although optic nerves appear normal on MRI [of her] brain.

See Transcript at 305.

Greer saw Zini on what appears to have been five occasions in 2015 for MS and headaches. See Transcript at 322-325 (01/30/2015), 318-321 (02/27/2015), 314-317 (05/06/2015), 309-313 (09/09/2015), 362-366 (11/10/2015). His progress notes reflect that her MS was moderate to severe, was causing lethargy, but was relieved with pain medication, rest, and muscle relaxants. His notes also reflect that her headaches were intermittent and moderate but finding an acceptable medication to treat them was proving to be difficult.

Greer saw Zini on multiple occasions in 2016 for MS and headaches. See Transcript at 357-361 (01/12/2106), 352-356 (03/10/2016), 347-351 (05/24/2016), 411-414 (11/07/2016), 425-428 (12/12/2016). His progress notes from those presentations are substantially similar to his progress notes from 2015. Her MS was moderate to severe, was causing lethargy, but was relieved with pain medication, rest, and muscle relaxants. Her headaches were intermittent and moderate but finding an acceptable medication to treat them was proving difficult. He did note, though, that she complained of a headache every morning and reported that husband had to "sit [her] up in bed because [she] just [could not] physically do it [herself.]" See Transcript at 411.

On November 7, 2016, Zini completed a Treating Physician's Migraine Headache Form. See Transcript at 410. In the form, Zini represented that Greer's headaches start in the back of her head and radiate forward to her left side. She experiences headaches more than three times a week, and they last, on average, twenty-four hours. Her headaches are accompanied by nausea and vomiting, photophobia, phonophobia, and throbbing/pulsating. She was taking medication in the form of Imitrex and hydrocodone. It was his opinion that her headaches will interfere with her ability to work and cause her to miss work.

Greer was also seen for her MS in 2016 by Dr. Sombabu Maganti, M.D., ("Maganti"). See Transcript at 373-376 (07/11/2016). Greer's history of present illness included the following complaints:

> ... [Greer] was diagnosed with multiple sclerosis incidentally while being evaluated for headaches in 2013. [Cerebrospinal Fluid] studies confirmed MS. She was started on Copaxone. She could not tolerate[] side effects and has to quite taking it (hair loss, loss of fatty [t]issue in the back of the head, exhaustion, psychosis). She took [C]opaxone for 3 months only. She was started on Plegridy after repeat[ed] MRI[s] showed continual worsening of MS lesions. While on Plegridy, she had MS relapse (May of 2015-right upper extremity numbness, tingling.) She was on Plegridy for 4 months and quit taking it. She was getting psychosis type symptoms on Plegridy as well. She has residual tingling sensation of the right upper extremity per report. No further episodes of one sided weakness, numbness, blindness. She [has a] history of headaches. She has been having 2 to 3 headaches per week-radiating from back of head to the front associated with nausea, photophobia, phonophobia, double vision.

See Transcript at 373. A physical examination was unremarkable. Maganti diagnosed "relapsing, remitting type multiple sclerosis and intractable migraine episodes." See Transcript at 375. She prescribed Depakote, Imitrex, and Phenergan.

MRI testing of Greer's brain and cervical spine was performed in June of 2017. See Transcript at 544-546. The results of the brain MRI revealed the following:

> Patchy [T2] hyperintense lesions within the cerebral white matter involving periventricular and juxtacortical regions. The appearance is consistent with underlying multiple sclerosis. Note that contrast was not administered, which precludes evaluation for active demyelination.

See Transcript at 545. The results of Greer's cervical spine MRI revealed the following:

> Numerous T2 hyperintense lesions scattered within the cervical spinal cord. Given the clinical history of multiple sclerosis, these are consistent with demyelination plaques. Note that contrast was not administered, which precludes evaluation for active demyelination. ... No significant degenerative changes. No narrowing of the spinal canal or foramina.

See Transcript at 546.

Another round of MRI testing of Greer's brain and cervical spine was performed in August of 2017. See Transcript at 546-548. The results of the brain MRI revealed the following: "No significant change in the mild burden of chronic demyelinating plaques compared with 6/1/2017. No new lesions identified. No areas of abnormal enhancement." See Transcript at 547. The results of the cervical spine MRI revealed the following: "No significant change in the chronic demyelinating plaques within the cervical spinal cord compared [with] 6/1/2017. No enhancing lesions identified." See Transcript at 548.

Greer continued to see Zini in 2017 and 2018. See Transcript at 538-541 (06/20/2017), 534-547 (08/28/2017), 529-533 (09/26/2017), 524-528 (11/14/2017), 519-523 (12/14/2017), 514-518 (02/07/2018), 508-513 (03/08/2018), 502-507 (04/05/2018). The progress notes from those presentations are similar in several respects. Greer's MS was consistently characterized as moderate to severe, continued to cause lethargy, but was relieved with pain medication, rest, and muscle relaxants. Zini repeatedly noted her complaints of fatigue and muscle pain. Her headaches were intermittent and moderate but finding an acceptable medication to treat them continued to prove difficult. Greer repeatedly complained of a headache every morning and continued to report that she required help in sitting up in bed. Physical examinations were typically routine, although she exhibited diminished strength, diminished tone, and a limited range of motion in her back.

Drs. Ben Johnson, M.D., ("Johnson") and Janet Cathey, M.D., ("Cathey") reviewed Greer's medical records at the request of the state agency and offered an assessment of Greer's residual functional capacity. See Transcript at 78-80, 96-98. Johnson and Cathey agreed that Greer retained sufficient residual functional capacity to perform a full range of light work.

The record contains a summary of Greer's work history. See Transcript at 210-228. It reflects that she had negligible FICA earnings between 2001 and 2015.

Greer testified during the administrative hearing. See Transcript at 31-42. She is very rarely able to do any chores around the house and only drives a little. She attributed her limited abilities to her headaches and the pain caused by her MS. She can only walk and/or stand for about five minutes before she must rest and cannot sit for more than five to ten minutes before experiencing pain. Greer can only lift about five pounds at one time. When she experiences a flare up of MS, she experiences pain in her neck. She has migraine headaches at least three times a week and takes several medications to treat them. Greer spends most of her day in her bedroom. When asked why, she answered as follows:

> A. Because I can't really do a whole lot. I can sit down for small period[s] of time. I have to lay down for a small period of time. And then I have to walk around for a small period of time but my room—I can find that I can sit in my bed. I can lay down on the bed but I have most of what I need right there.
>
> Q. So how much of the day would you actually be away from your bedroom or away from a couch or away from the floor and actually doing something in a typical average day?
>
> A. Maybe an hour.

Q. And what would you be doing in that hour of the 24 hours that you're living in the day?

A. Either going to the bathroom or getting my son and daughter something to eat or drink.

Q. Okay.

A. Maybe two hours.

Q. What is the longest you could do that at one time without taking any break whatsoever?

A. Five to ten minutes usually.

See Transcript at 37. Greer has pain in her head, neck, and shoulder. On bad days, her pain is about nine to ten on a ten-point pain scale.[3]

The ALJ found that Greer's severe impairments include MS and migraines, but she does not have an impairment that meets or equals a listed impairment. The ALJ assessed Greer's residual functional capacity and found that Greer is capable of performing light work with the following physical limitation: she is incapable of performing work that involves frequent balancing or the climbing of ladders, ropes, or scaffolds. As a part of so finding, the ALJ gave reduced weight to Zini's opinions. The ALJ gave the following reason for doing so:

---

[3] Greer's mother also testified during the administrative hearing. See Transcript at 42-47.

> [Greer's] primary care physician [i.e., Zini] completed a headache questionnaire in which he opined that [she] would miss work at least one day per week for migraines. ... However, his report of the medications [she] was taking was inconsistent with his own treatment records. He reported that she was taking Imitrex when his treatment records showed she was not. His opinion is accorded reduced weight for inconsistency with his own treatment notes.

See Transcript at 20. The ALJ found that Greer has no past relevant work, but a hypothetical individual with Greer's limitations could perform work as a cashier or a sales attendant.

Greer first maintains that her migraine headaches were not evaluated in accordance with Listing 11.02, the listing she maintains is the most closely analogous listing for her headaches. She maintains that given her symptoms and how they correspond to the listing, "a more thorough consideration of [her] chronic migraines is warranted at step three of the sequential evaluation process." See Docket Entry 11 at CM/ECF 14.

At step three, the ALJ is required to determine whether a claimant's impairments meet or equal a listed impairment. See Raney v. Barnhart, 396 F.3d 1007 (8th Cir. 2005). The determination is solely a medical one, see Cockerham v. Sullivan, 895 F.2d 492 (8th Cir. 1990), and the claimant bears the burden of showing that her impairment meets or equals a listed impairment, see Pyland v. Apfel, 149 F.3d 873 (8th Cir. 1998).

The ALJ found at step three that Greer's impairments do not meet or equal a listed impairment. There is no indication that the ALJ considered whether Greer's migraine headaches meet or equal Listing 11.02.[4] The Court accepts Greer's representation that the ALJ should have considered the listing. The ALJ's failure to do so does not warrant a remand, though, because the record supports his overall conclusion at step three.[5] The Court so finds for two reasons. First, Greer has failed to produce medical evidence supporting her assertion that her headaches meet or equal the criteria set forth in Listing 11.02. Second, with respect to the medical evidence that is in the record, the Court can only guess as to what evidence might meet or equal the criteria set forth in the listing.

Greer offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. She maintains that her residual functional capacity was erroneously assessed because the medical opinions were not given proper weight, and insufficient consideration was given to the side effects of her medication.

4 The Court accepts Greer's representation that Listing 11.02 is the most closely analogous listing for migraine headaches.

5 See Pepper on behalf of Gardner v. Barnhart, 342 F.3d 853 (8th Cir. 2003) (although preferable that ALJ address a specific listing, failure to do so is not reversible error if record supports overall conclusion at step three).

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite her limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record. See Jones v. Astrue, 619 F.3d 963 (8th Cir. 2010).

In assessing the claimant's residual functional capacity, the ALJ must weigh the medical opinions in the record and resolve any conflicts among them. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). A treating physician's medical opinions are entitled to controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence. See Michel v. Colvin, 640 Fed.Appx. 585 (8th Cir. 2016). The opinions may be discounted if, for example, they are inconsistent with the physician's own treatment notes. See Adair v. Saul, --- Fed.Appx. ---, 2020 WL 2988696 (8th Cir. June 4, 2020).

The ALJ discounted Zini's medical opinions in the Treating Physician's Migraine Headache Form because they are inconsistent with Zini's own progress notes. Although the ALJ only gave one example to support his reason, the reason is a good reason for discounting Zini's medical opinions and is supported by substantial evidence on the record as a whole.

The Court begins by noting that Zini's medical opinions are rendered in what is tantamount to a one-page checklist format, which is of limited value. See Papesh v. Colvin, 786 F.3d 1126 (8th Cir. 2015). He provided no objective medical evidence to support his opinions and provided no explanation for how he came to hold the opinions. In fact, many of his opinions appear to be based on Greer's self-reports. Additionally, Zini offered no opinions as to the functional limitations caused by Greer's headaches.[6] Although he did opine that her headaches will interfere with her ability to work and cause her to miss work, the opinion is confusing in that it is not clear how many days of work he believed she will miss each week: at least one or a full seven.[7] Given the format in which the opinions are rendered, the ALJ could reasonably discount them. The Court understands, though, that the Treating Physician's Migraine Headache Form is but one part of larger record, and the form should be, and will be, read in light of that record.

---

6 A treating physician's medical opinions may be discounted if they do not identify specific functional limitations. See Adair v. Saul, 2020 WL 2988696 (medical opinion did not identify claimant's specific functional limitations so other evidence in the record was more instructive when determining which work-related activities claimant could perform).

7 The ALJ understood Zini to believe that Greer's headaches would cause her to miss work "at least one day per week." See Transcript at 20. Greer understands Zini to believe that Greer "would be unable to work seven days per week" because of her headaches. See Docket Entry 11 at CM/ECF 5.

In the Treating Physician's Migraine Headache Form, Zini opined that Greer's headaches occur greater than three times a week and last, on average, twenty-four hours. His progress notes are capable of more than one acceptable interpretation, and it is possible to construe them so as to be inconsistent with those opinions. The notes make little mention of how often she experiences headaches, save his observation that they are intermittent. See Transcript at 341, 338, 334, 314, 309, 362, 357, 352, 347, 411. With respect to their duration, he simply notes that they began several years earlier but makes little mention of how long her headaches last once they begin.[8]

Zini opined that Greer was taking Imitrex and hydrocodone for her headaches. His progress notes reflect that although she had taken, or was taking, hydrocodone, he appears to have not prescribed Imitrex. It is true that Maganti had prescribed Imitrex in July of 2016, or prior to Zini's completion of the Treating Physician's Migraine Headache Form, see Transcript at 375, but there is nothing to indication that Zini reviewed Maganti's progress note before completing the form.

---

[8] Zini also opined that Greer's headaches are accompanied by nausea and vomiting, photophobia, phonophobia, and throbbing/pulsating, and his progress notes contain similar observations. His opinion is of little value in assessing her residual functional capacity, though, because he failed to explain how the symptoms impact the most she can do despite her limitations.

Zini also opined that Greer's headaches will interfere with her ability to work and cause her to miss work for some number of days each week. His progress notes do not support his opinion. Notwithstanding the confusion surrounding the precise number of days he believes she will miss each week, he repeatedly observed that her headaches are moderate in severity. See Transcript at 341, 338, 334, 314, 309, 362, 357, 352, 347, 411. Given Zini's observations that Greer's headaches are intermittent and moderate, the ALJ could reasonably discount Zini's opinion that Greer will miss work multiple days each week.

It was possible for the ALJ to reasonably conclude that Zini's medical opinions are inconsistent with his progress notes. Accordingly, the ALJ could reasonably discount Zini's opinions.

Greer faults the ALJ for according too much weight to the opinions of Johnson and Cathey.[9] The record reflects, though, that their opinions were but one of the factors the ALJ relied upon in assessing Greer's residual functional capacity. In fact, the ALJ found that Greer's limitations are more severe than Johnson and Cathey opined. The ALJ could find that the opinions have support in the record, and he did not err in weighing them.

---

[9] It is axiomatic that the medical opinions of a non-examining physician are generally accorded less weight than those of an examining physician. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010).

Greer also faults the ALJ for failing to fully develop the record. Greer so maintains because the record does not contain an assessment from a treating or examining physician addressing Greer's functional limitations.

There is no requirement that the assessment of a claimant's residual functional capacity be supported by a specific medical opinion. See Hensley v. Colvin, 829 F.3d 926 (8th Cir. 2016). In the absence of opinion evidence, the medical records of the most relevant treating physicians can provide affirmative medical evidence supporting the assessment. See Id.

The Court is satisfied that the ALJ adequately developed the record, and there is sufficient information for him to have made an informed decision. It is true that there is no opinion from a treating or examining physician addressing Greer's functional limitations. Although such an opinion would have been helpful, one was not required. The ALJ could and did rely upon Chenault, Zini, Mylavarapu, and Maganti's progress notes in crafting the assessment of Greer's residual functional capacity. The ALJ could reasonably find from their notes that Greer's MS is relapsing-remitting, and when flare ups occur, they did not require medical attention. The ALJ could also reasonably find from their notes that Greer's headaches are moderate and intermittent. Given those findings, the ALJ could find that Greer is capable of a reduced range of light work.

Greer offers a second reason why her residual functional capacity was erroneously assessed. She maintains that insufficient consideration was given to the side effects of her medication.

As a part of assessing the claimant's residual functional capacity, the ALJ is required to evaluate the claimant's subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ must consider all of the evidence, including evidence of "the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms." See Social Security Ruling 16-3p.

The record reflects that the ALJ considered the side effects of Greer's medication, and substantial evidence on the record as a whole supports his consideration of the side effects. For example, he noted that Plegridy injections caused her to have adverse reactions, one of which was that she lost feeling in her right arm. See Transcript at 18. He noted that she had taken Tecfidera but stopped taking it because it caused nausea and vomiting. See Transcript at 18. The ALJ noted that Greer had taken amitriptyline but stopped taking it because it caused "anger issues." See Transcript at 19. Additionally, he noted that she had taken prednisone but stopped taking it because "steroids worsened her headaches." See Transcript at 19.

The governing standard in this case allows for the possibility of drawing two inconsistent conclusion. See Culbertson v. Shalala, 30 F.3d 934 (8th Cir. 1994). The ALJ crafted an assessment of Greer's residual functional capacity that limited her to a reduced range of light work, and Greer has not shown why the ALJ erred in doing so.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Greer's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 10th day of August, 2020.

UNITED STATES MAGISTRATE JUDGE